# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

June 12, 2020

Lyle W. Cayce
Clerk

No. 18-20274

SPRING BRANCH INDEPENDENT SCHOOL DISTRICT,

      Plaintiff - Appellant

v.

O.W., by next friend Hannah W.,

      Defendant - Appellee

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

HANNAH W., as Parent/Guardians/Next Friends of O.W., an Individual with a Disability; DANIEL W., as Parents/Guardians/Next Friends of O.W., an Individual with a Disability; O.W.,

      Plaintiffs - Appellees

v.

SPRING BRANCH INDEPENDENT SCHOOL DISTRICT,

      Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

ON PETITION FOR REHEARING

No. 18-20274

Before HIGGINSON and WILLETT, Circuit Judges, and BROWN, District Judge.*

DEBRA M. BROWN, District Judge:

Upon panel rehearing, we withdraw our prior opinion, *Spring Branch Indep. Sch. Dist. v. O.W.*, 938 F.3d 695 (5th Cir. 2019), and substitute the following:

After years of private schooling, O.W., a minor, enrolled in the fifth grade in the Spring Branch Independent School District for the 2014–2015 academic year. From his first day of school, O.W. struggled behaviorally and, despite having a history of mental illness, was not referred for a special education evaluation until January of 2015. Following transfers to two different programs, O.W.'s behavioral problems continued. Ultimately, O.W. was withdrawn from school with three days remaining in the academic year. An administrative hearing officer found the School District violated the Individuals with Disabilities Education Act and awarded O.W. two years of private school tuition. The district court affirmed the award and the School District appealed. We AFFIRM in part, REVERSE in part, and REMAND.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The factual and procedural record in this case is extensive but largely undisputed.[1]

### A.  O.W.'s Early Education

During the summer of 2009, Hannah W. and Daniel W. registered O.W.,

---

* District Judge of the Northern District of Mississippi, sitting by designation.

[1] The amicus brief of Disability Rights Texas cites evidence outside the appellate record to establish that "[s]chool districts throughout Texas have intentionally disregarded their Child Find duties." This Court ordinarily does not consider evidence outside the record on appeal, *McIntosh v. Partridge*, 540 F.3d 315, 327 (5th Cir. 2008), and will not do so here.

their minor son, for kindergarten at Nottingham Elementary in the Spring Branch Independent School District. Although O.W. possessed a well-above average intelligence,[2] he experienced various behavioral problems at Nottingham, including aggression towards other children.

After O.W. completed his kindergarten year, his parents enrolled him at Rainard, a private school. O.W. attended Rainard as a first grader (the 2010–2011 academic year) and a second grader (the 2011–2012 academic year). Following a self-harm attempt during his second grade year, O.W.'s parents moved him to The New School in the Heights, a private school for children with social-emotional challenges. O.W. attended The New School for third grade (the 2012–2013 academic year) and fourth grade (the 2013–2014 academic year). O.W. exhibited behavioral problems at The New School but finished the fourth grade with passing scores.

## B.  Return to Nottingham

In the summer of 2014, O.W.'s parents registered O.W. for the fifth grade (the 2014–2015 academic year) at Nottingham. Before the start of the term, Ms. W. provided Nottingham officials with an August 7, 2014, letter from Dr. Robbi Wright, who had served as O.W.'s psychiatrist since the end of 2012. The letter stated that O.W. suffered from attention deficit hyperactivity disorder and would thus benefit from § 504[3] accommodations. Ms. W. also spoke with O.W.'s teacher "to provide a little background" about O.W.

On the first day of school, teachers discovered violent images of murder

---

[2] O.W.'s IQ was most recently measured in the "superior" range.

[3] Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), "broadly prohibit[s] discrimination against disabled persons in federally assisted programs or activities." *D.A. ex rel. Latasha A. v. Hous. Indep. Sch. Dist.*, 629 F.3d 450, 453 (5th Cir. 2010). The provision differs from the IDEA in that the "IDEA guarantees individually tailored educational services for children with disabilities, while Title II [of the Americans with Disabilities Act] and § 504 promise non-discriminatory access to public institutions." *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 756 (2017).

and death drawn by O.W, which also included anti-Semitic language and imagery, as well as obscenities. That day, Ms. W. conferenced with Nottingham's principal regarding the images.

The next day, O.W. held up his middle finger, used obscenities, and refused to follow directions. When administrators came to the classroom to assist the teacher, O.W., who was sitting on a bookshelf and refusing to come down, hurled insults laced with pejorative, vulgar, and racist terms. He then moved on from hurling words to hurling objects, throwing writing utensils at the assistant principal.

Over the next few days, Ms. W. spoke often with Nottingham's principal and assistant principal, during which she informed them that O.W. transferred from a therapeutic school, that he had difficulty with transitions, and that he suffered from Oppositional Defiant Disorder, Mood Disorder, Anxiety, and Depression.

Ms. W. also provided the school with contact information for Dr. Powell-Williams, a counselor from The New School who had provided daily counseling to O.W. Dr. Powell-Williams spoke with school staff and offered strategies to manage O.W. Also, district officials collaborated with O.W.'s parents and worked with O.W. "to find out what could be used as incentives to get him to complete his work." Despite these efforts, O.W. continued to act out by regularly engaging in acts of verbal and physical aggression, including using extreme profanity and throwing objects at the teacher; refusing to follow directions; leaving assigned areas, including the classroom, without permission; disrupting lessons by pushing keys on the teacher's laptop, playing with the ActivBoard, and yelling profanities from the back of the classroom; sleeping excessively in class; insulting fellow students; and touching or taking others' property. By early October of 2014, O.W. was interrupting classes daily.

On September 16, 2014, Nottingham provided Ms. W. a § 504 "Notice of

Rights" and notice of a § 504 eligibility meeting to be held October 1, 2014. At approximately the same time, Ms. W. signed a "Notice and Consent for Initial Section 504 Evaluation," consenting to an evaluation of O.W. to determine whether he qualified for § 504 accommodations.

On September 23, 2014, Ms. W. provided a Family History Form to the School District which included a history of O.W.'s behavioral problems and a list of his medications. Ms. W. also provided the School District with a May 2012 evaluation of O.W. performed by Dr. Susan Rosin. Dr. Powell-Williams called the principal and discussed the possibility of a special education evaluation of O.W. Ultimately, the School District postponed the October 1 meeting until October 8, 2014, apparently to allow the School District's Licensed Specialist in School Psychology (LSSP) to review Dr. Rosin's evaluation.

At the October 8 meeting, the School District determined that O.W., who was removed from class on a daily basis due to his disruptive behavior, qualified for § 504 accommodations. To this end, O.W.'s parents and administration officials agreed to a behavior intervention plan (BIP), which appears to have been put in place.[4] The plan utilized "Success Charts" which tracked O.W.'s problematic behaviors at thirty-minute intervals and provided rewards for good behavior. Notes from the meeting reflect O.W. was "at Level 2 intervention [methods but] may need to go to Tier 3."

The BIP's implementation had a minimal impact on O.W.'s behavior. The frequency of his misconduct "diminish[ed]" for a short time—O.W. was only disciplined once from October 8 until November 4 after being disciplined eight

---

[4] Ms. W. testified at the administrative hearing that during the meeting, she requested a special education evaluation for O.W. but the LSSP in attendance stated the evaluation was unnecessary. An administration official at the meeting testified she did not recall the request. Notes from the meeting do not include the request. However, both the hearing officer and the district court determined the request was made.

times from August 26 through October 6. However, O.W. was disciplined three times in November, including for a "major disru[ption]" related to him climbing the walls of the gym. In addition to these documented incidents of discipline, O.W. twice fell asleep in class during the month of November. Furthermore, by the end of the semester, his grades had dropped.

On January 9, 2015, O.W. hit a staff member in the back with a jacket. Shortly after, O.W. assaulted his fifth-grade teacher, "kicking her and hitting her with a closed fist." The second of these incidents resulted in the teacher bringing charges against O.W.

On January 15, 2015, the School District convened a second § 504 meeting. At the meeting, the School District informed O.W.'s parents that O.W. would be referred for a special education evaluation and that during the evaluation O.W. could either remain a student at Nottingham with a new teacher and a personal aide, or enroll at the School District's Turnaround Opportunities through Active Learning (TOTAL) program. O.W.'s parents agreed to enroll O.W. in TOTAL.

## C. Development of IEP

While enrolled in TOTAL, O.W. was assigned a multidisciplinary team which included an LSSP, an educational diagnostician, and a speech-language pathologist. Following a brief delay to consider a February 2015 private report provided by O.W.'s parents, the team completed a Full Individual Evaluation (FIE) on February 24, 2015. Although a private report provided by O.W.'s parents diagnosed O.W. with autism,[5] the evaluation team rejected the diagnosis. The team determined O.W. was a "student with poor emotional and

---

[5] Following the October 8, 2014, meeting, O.W.'s parents paid for a private Independent Educational Evaluation which was performed in December 2014. The resulting report, which was produced in February 2015, diagnosed O.W. with Autism Spectrum Disorder.

No. 18-20274

behavioral regulation" who suffers from an Emotional Disturbance.

On March 11, 2015, an Admission, Review and Dismissal Committee (ARDC)[6] convened to consider the FIE and develop an IEP for O.W. Based on a Functional Behavior Assessment and consultation with O.W.'s parents, the ARDC developed a BIP. As explained by the district court, the BIP:

> focused on using positive behavioral approaches. For physical aggression (e.g., throwing objects, hitting, kicking, destroying school property), staff were to help O.W. learn replacement behaviors (e.g., removing himself to a cooling-off area, implementing deep breathing, calming sequences, stop and think). Additionally, staff were to avoid power struggles and arguments, and instead offer choices, frequent/movement breaks, and access to preferred activities. For verbal aggression (e.g., threats, profanity, obscene gestures, name calling), staff were to teach O.W. alterative phrases, avoid power struggles, allow frequent/movement breaks, provide access to preferred activities and a cooling-off area, and provide direct instruction on ways to verbalize discontent. Again, staff were to use calm interaction styles and minimize verbal interactions. For the behavioral problem of leaving the classroom, staff were to offer a visual schedule, clear rules, offer choices, frequent/movement breaks, provide access to preferred activities or a cooling-off area, and reinforce desired behaviors. Again, staff were to use a calm interaction style and redirect O.W. back to assigned areas, and remind him of his ability to access the cooling-off area. The IEP does not state that time-outs or restraints would be used as a tactic to address any of the above conduct.

The ARDC and O.W.'s parents also agreed to enroll O.W. in an "adaptive behavior program" located at Ridgecrest Elementary School. O.W. enrolled at Ridgecrest on March 23, 2015. While at Ridgecrest, O.W. maintained passing grades in all his classes and passed all portions of the State of Texas

---

[6] Under Texas law, each district must establish an ARDC "for each eligible student with a disability and for each student for whom a full individual and initial evaluation is conducted . . . ." 19 Tex. Admin. Code § 89.1050. "The ARD committee is the individualized education program (IEP) team defined in federal law and regulations . . . ." *Id.*

Assessments of Academic Readiness.

### D.  Implementation of IEP

At Ridgecrest, when O.W. engaged in inappropriate conduct (known as "target behavior"), he was provided a "redirection," then a warning, then two warnings, and then directed to a desk (take-desk) in the classroom for a five minute period (Take 5) or a ten minute period (Take 10). During these periods, O.W. was given the opportunity to pursue replacement behavior, such as drawing. Disciplinary records show O.W. was placed in a Take 5 or Take 10 on sixteen of his forty days at Ridgecrest.

In addition to the take-discipline, O.W. was physically restrained on eight occasions. Each instance of restraint was preceded by physical aggression by O.W. and attempts at de-escalation by Ridgecrest staff. On at least four occasions, Ridgecrest summoned police as a result of O.W.'s behavior. However, because O.W. often calmed down before the police arrived, it appears the police spoke with O.W. only once.

On May 5, 2015, police were summoned to O.W.'s classroom after teachers attempted de-escalation (providing choices of alternative activities, verbal redirection, calming techniques, and reduced verbal interaction); O.W. repeatedly struck his teacher with a closed fist and then charged at her; and the teachers restrained O.W. Upon entering the classroom, the officer "stated to [O.W.] who was in charge, and [then] asked if he wanted to go to jail." The officer also asked if O.W. "remembered why he was in a cop car last time." After the interaction with police, O.W. "picked his ears until they were bloody and oozing," "chewed his shirt," and was unable to sleep or shower by himself.

The day after the police intervention occurred, Ridgecrest faculty and Ms. W., without consultation with O.W.'s ARDC, agreed in writing that O.W.'s school day should begin at 9 a.m. instead of the normal 7:30 a.m. On May 18, 2015, school officials and Ms. W. agreed that O.W.'s school day should be

shortened to three hours, from 9 a.m. until noon. The e-mail memorializing this agreement states, "this means a brief ARD [but] that he will begin the schedule tomorrow." Ultimately, at the suggestion of Dr. Powell-Williams, O.W. left Ridgecrest with three days left in the school year.

### E.  Fusion Academy and Administrative Proceedings

The following summer, O.W.'s parents enrolled him for tutoring at Fusion Academy, a private institution. Because O.W.'s parents and teachers noticed an improvement in O.W.'s behavior and performance, O.W.'s parents elected to enroll O.W. at Fusion for the 2015–2016 academic year. On August 14, 2015, less than ten days before the beginning of the School District's school year, O.W.'s parents informed the School District that O.W. would not be re-enrolling.

O.W. attended Fusion for the 2015–2016 academic year. However, on February 16, 2017, O.W. set fire to a school trash can. Due to this incident O.W. was removed from school and O.W.'s parents were informed he would not be allowed to return until he received "intervention." Following his removal, the W.'s enrolled O.W. at Little Keswick, a residential school in Virginia.

O.W.'s parents filed an administrative complaint against the School District on October 28, 2015. The complaint sought reimbursement for private school tuition, private placement, and other equitable relief. On February 23, 2016, O.W.'s parents filed an amended administrative complaint.[7] The parties appeared for an administrative hearing on May 24, 2016.

On August 5, 2016, the hearing officer issued a decision in O.W.'s favor on four issues, finding that (1) the School District violated its child find obligation because it did not timely refer O.W. for a special education

---

[7] The amendment added three allegations not contained in the original complaint related to alleged failures to convene ARDC meetings, and a failure to provide a FAPE for the 2014–2015 academic year and beyond.

evaluation; (2) the School District failed to provide O.W. a free appropriate public education (FAPE) for the 2014–2015 academic year because it did not timely fulfill its child find duties, because it violated his IEP by placing him in school for only three hours a day, and because O.W., who was gifted and talented, was failing math; (3) the reduction of hours in May 2015 deprived O.W. of a commensurate school day; and (4) the School District failed to implement O.W.'s IEP because it used restraints, time-outs, and police intervention, and reduced O.W.'s school hours.

Based on these findings, the hearing officer determined that O.W. was entitled to reimbursement from the School District for $50,250 in tuition and tutoring for O.W.'s enrollment at Fusion for the 2015–2016 academic year, and that O.W. was entitled to a compensatory education award of tuition for Fusion for the 2016–2017 school year.

## F. District Court Proceedings

On August 30, 2016, the School District appealed the administrative decision to the United States District Court for the Southern District of Texas. The administrative appeal was consolidated with a separate fee petition filed by O.W.'s parents which seeks attorney's fees for the underlying administrative action.

The parties filed cross motions for summary judgment on the hearing officer's decision. Additionally, the W.'s sought an order that the School District pay $125,000 for O.W.'s tuition at Little Keswick as a "stay put"[8] remedy. The district court denied the request for "stay put" relief, finding that a "newly articulated program proposed by" the School District which would provide

---

[8] The IDEA's "stay put" provision provides that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child . . . ." 20 U.S.C. § 1415(j).

O.W. one-on-one instruction "is the appropriate stay-put placement during the pendency of this appeal given O.W.['s] inability to continue attending Fusion Academy."

On March 29, 2018, the district court granted the W.'s summary judgment motion, affirmed the hearing officer's decision, and denied the School District's motion for summary judgment. This appeal followed. During the pendency of the appeal, two amicus briefs were filed—one by the Council of Parent Attorneys and one by Disability Rights Texas. Both briefs support the district court's decision.

## II.  STANDARD OF REVIEW

"[F]or appeals in IDEA actions, [the] standard of review for . . . summary judgments is obviously more expansive than the usual *de novo* review for summary judgments . . . prescribed by Federal Rule of Civil Procedure 56(a)." *E.R. ex rel. E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 762 (5th Cir. 2018). We "review[] legal questions *de novo* and factual questions for clear error." *Dallas Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 309 (5th Cir. 2017). "Mixed questions should be reviewed under the clearly erroneous standard if factual questions predominate, and *de novo* if the legal questions predominate." *Seth B. ex rel. Donald B. v. Orleans Par. Sch. Bd.*, 810 F.3d 961, 967 (5th Cir. 2016) (quoting *Beech v. Hercules Drilling Co.*, 691 F.3d 566, 569 (5th Cir. 2012)).

Of relevance here, determinations of whether a school district failed to provide a FAPE or failed to comply with its child find duty in a timely manner are mixed questions which we review de novo. *Krawietz ex rel. Parker v. Galveston Indep. Sch. Dist.*, 900 F.3d 673, 676 (5th Cir. 2018) (child find decision reviewed de novo); *Woody*, 865 F.3d at 309 (FAPE decision reviewed de novo). The underlying factual determinations are reviewed for clear error. *Krawietz*, 900 F.3d at 676; *Woody*, 865 F.3d at 309.

## III.  DISCUSSION

On appeal, the School District challenges the district court's conclusions that (1) the School District breached its child find duty with regard to O.W.; (2) the School District failed to fully implement O.W.'s IEP; and (3) two years of private placement tuition was an appropriate remedy for O.W.

### A.  Child Find

Pursuant to the IDEA's child find requirement, a state receiving federal funds must maintain policies and procedures to ensure, among other things, that "[a]ll children with disabilities . . . who are in need of special education and related services, are identified, located, and evaluated . . . ." 20 U.S.C. § 1412(a)(3). While the statute's implementing regulations define "how quickly a school district must act after consent for an evaluation is received, . . . neither the statute nor regulations seek to set a time between notice of a qualifying disability and referring the student for an evaluation . . . ." *Woody*, 865 F.3d at 319. This Court, however, has inferred a "reasonable-time standard" into the provision. *Id.* at 320. Thus, a school district must "identify, locate, and evaluate students with suspected disabilities within a reasonable time after the school district is on notice of facts or behavior likely to indicate a disability." *Krawietz*, 900 F.3d at 676 (internal quotation marks and citation omitted).

Here, the hearing officer found the School District violated its child find duty when it "waited until January 2015 to refer [O.W.] to special education" despite the fact that it should have suspected O.W. suffered from a disability "[b]y the October 28, 2014 accrual date for this proceeding . . . ." The district court upheld the hearing officer's decision based on a finding that the School District's time to evaluate began to run on October 8, 2014. Citing 34 C.F.R. § 300.534, the district court further held that "given O.W.'s constant violation of the student code of conduct due to his special needs, SBISD was charged with expediting the evaluation process." Ultimately, the district court determined

No. 18-20274

the delay between October 8, 2014 (the date of the alleged notice) and January 15, 2015 (the date of the referral for evaluation) was unreasonable.

The School District argues the district court improperly relied on § 300.534 to find the need for an expedited review process and, in the absence of such a need, there was no child find violation.

### 1. Was an expedited evaluation required?

20 U.S.C. § 1415(k)(5) provides protections for "[a] child who has not been determined to be eligible for special education and related services . . . and who has engaged in behavior that violate[s] a code of student conduct . . . ." Generally, these protections apply if the educational institution "had knowledge . . . that the child was a child with a disability before the behavior that precipitated the disciplinary action occurred." *Id.* However, in the absence of knowledge, the statute provides:

> If a request is made for an evaluation of a child during the time period in which the child is subjected to disciplinary measures under this subsection, the evaluation shall be conducted in an expedited manner. If the child is determined to be a child with a disability, taking into consideration information from the evaluation conducted by the agency and information provided by the parents, the agency shall provide special education and related services in accordance with this subchapter, except that, pending the results of the evaluation, the child shall remain in the educational placement determined by school authorities.

20 U.S.C. § 1415(k)(5)(D)(ii).

34 C.F.R. § 300.534, the implementing regulation for § 1415(k)(5), contains virtually identical language but clarifies that an expedited evaluation is required when "a request is made for an evaluation of a child during the time period in which the child is subjected to disciplinary measures under § 300.530 . . . ." 34 C.F.R. § 300.534(d)(2)(i). Section 300.530, in turn, governs removal of a student from his or her current placement for more than ten days in a school year.

13

No. 18-20274

Neither the child find provisions nor the expedited evaluation provisions refer to the other. Thus, in the absence of plain language connecting the provisions, we "employ can[]ons of statutory construction to discern the legislature's intent." *Vielma v. Eureka Co.*, 218 F.3d 458, 464 (5th Cir. 2000). At least four aspects of the statutes suggest Congress intended that the requirements exist independently.

First, the absence of any cross reference between the two provisions suggests independence. *Chamber of Commerce of U.S.A. v. U.S. Dep't of Labor*, 885 F.3d 360, 381 (5th Cir 2018) ("Congress's use and withholding of terms within a statute is taken to be intentional.").

Second, beyond sharing general references to evaluations, the statutes and regulations are drastically different—the child find requirement details procedures for identifying disabled students while the expedited evaluation requirement is in a provision addressing procedures for discipline. *Charvat v. NMP, LLC*, 656 F.3d 440, 449 (6th Cir. 2011) ("[T]he two private-right-of-action provisions contain significant textual differences, indicating that they are distinct provisions to be treated independently.").

Third, the expedited evaluation requirement is in a subparagraph titled "Limitations," which is located in a subsection titled "Conditions that apply if no basis of knowledge [of disability]." 20 U.S.C. § 1415(k)(5)(D)(ii). Thus, in context, the expedited evaluation requirement stands as a "Limitation" on a school district's ability to discipline a student in the absence of knowledge of a disability, not as an element of the separate child find requirement. *See House v. C.I.R.*, 453 F.2d 982, 987 (5th Cir. 1972) ("[I]t is proper to consult both the section heading and the section's content to come up with the statute's clear and total meaning.").

Fourth, the expedited evaluation requirement only triggers when the child is subjected to disciplinary proceedings, a request for an evaluation has

14

been made, and the institution *lacked* knowledge that the child was a child with a disability before the behavior that precipitated the discipline.[9] 34 C.F.R. § 300.534(d). To hold that the expedited evaluation requirement is incorporated into the child find reasonableness requirement would be to hold that a school district with previous knowledge of a suspended student's disability *does not* violate the child find requirement by failing to conduct an expedited evaluation, while a school district *without* previous knowledge of the disability *would* violate the child find requirement by failing to conduct an expedited evaluation. This absurd result suggests a finding that the provisions are separate. *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 630 F.3d 431, 439 (5th Cir. 2011) ("[W]e should avoid any interpretation that would lead to absurd or unreasonable outcome[s] . . . .") (quotation marks omitted).

In sum, the IDEA's text and structure, including its implementing regulations, compel a conclusion that the child find and expedited evaluation requirements are separate and independent such that a violation of the latter does not mean a violation of the former. To the extent the district court held otherwise, this was error.[10]

## 2. Did a child find violation occur?

A finding of a child find violation turns on three inquiries: (1) the date the child find requirement triggered due to notice of a likely disability; (2) the date the child find duty was ultimately satisfied; and (3) the reasonableness of the delay between these two dates. *See Krawietz*, 900 F.3d at 676.

---

[9] *See also Letter to Nathan,* OSEP (available at https://sites.ed.gov/idea/files/osep-letter-to-nathan-01-29-2019.pdf) ("While an LEA may choose or find it necessary to expedite evaluations in these circumstances, under IDEA expedited evaluations are only required in situations where the LEA is not deemed to have knowledge that the child may have a disability . . . .").

[10] Because O.W. did not assert an independent claim arising from a failure to perform an expedited evaluation, we need not reach the School District's alternate argument that an expedited evaluation was not required under the IDEA.

No. 18-20274

The School District does not challenge the district court's finding that October 8, 2014, represents the appropriate notice date and we see no error in that conclusion. *See Krawietz*, 900 F.3d at 677 (finding sufficient notice based on "academic decline, hospitalization, and incidents of theft"). We also agree with the parties that the January 15, 2015, referral for evaluation represents the appropriate end date for the reasonableness inquiry. *See Woody*, 865 F.3d at 320 (considering time period between notice and referral for evaluation). The only dispute then is whether the delay between October 8, 2014, and January 15, 2015 (99 days, or three months and seven days), was reasonable.[11]

This Court has twice considered the reasonableness of delay in the child find context. In *Woody*, this Court considered an 89-day delay between notice and referral to be reasonable where the local education agency spent the period "requesting and gathering information on [the student] in an effort to classify her and determine its obligations," and where more than a month of the period was spent waiting for the parents of the student to provide specific information. 865 F.3d at 320. In the end, this Court concluded that the "facts suggest[ed] reasonableness, with neither the District nor the parent reacting with urgency or with unreasonable delay." *Id.*

In contrast, in *Krawietz*, this Court found a four-month delay unreasonable where the school district "failed to take any appreciable steps toward complying with its Child Find obligation" during the relevant time period. 900 F.3d at 677. In reaching this conclusion, this Court rejected the school district's reliance on the student's parents' failure to act with urgency

---

[11] Citing Texas' one-year statute of limitations for IDEA claims, the School District urges us to look at its actions after October 28, 2014. Because "events preceding [the statute of limitations bar] may provide evidence of a child-find violation," we decline to limit the inquiry in this way. *See Mr. P. v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 750 (2d Cir. 2018) (considering the time frame from the relevant trigger date, even though it predated the limitations bar).

16

because "the IDEA imposes the Child Find obligation upon school districts, not the parents of disabled students." *Id*. This Court thus distinguished the case from the facts of *Woody*, noting that *Woody* involved a delay which "was not solely attributable to the district and [a] district . . . [which] took proactive steps throughout [the] period to comply with its Child Find obligation." *Id*.

Taken together, *Krawietz* and *Woody* stand for the proposition that the reasonableness of a delay is not defined by its length but by the steps taken by the district during the relevant period. A delay is reasonable when, throughout the period between notice and referral, a district takes proactive steps to comply with its child find duty to identify, locate, and evaluate students with disabilities. Conversely, a time period is unreasonable when the district fails to take proactive steps throughout the period or ceases to take such steps.

The School District argues this case is closer to *Woody* than *Krawietz* because it was entitled to attempt regular behavioral interventions—a process known as response to intervention (RTI)—and § 504 accommodations prior to referral, and such steps were consistent with its child find obligations. We disagree. In light of the acts and behaviors observed by the School District in this case, its failure to pursue evaluation, even while concurrently implementing intermediate accommodations, can be described as nothing less than a delay or denial.

We in no way suggest that a school district *necessarily* commits a child-find violation if it pursues RTI or § 504 accommodations before pursuing a special education evaluation. We instead recognize that determining whether a child find violation occurred is a fact-intensive inquiry and highlight that § 504 accommodations are not a substitute for an evaluation once a school district is "on notice of acts or behavior likely to indicate a disability." *Krawietz*, 900 F.3d at 676. The Child Find obligation is for a "child with a disability" who, by reason of that disability, "needs special education and related services." 20

U.S.C. § 1401(3)(A).

Though compliance with § 504 does not absolve a school district of its duty to comply with the IDEA, we do recognize that there may be cases where intermediate measures are reasonably implemented before resorting to evaluation.  For instance, in *D.K. v. Abington School District*, the Third Circuit noted that "the measures the School District did take to assist D.K. in the classroom militate against finding a Child Find violation." 696 F.3d 233, 252 (3d Cir. 2012). There, the behavior demonstrated by D.K.—hyperactivity, difficulty following instructions, and tantrums—"was typical of boys his age." *Id.* at 251. Accordingly, it was reasonable for the School District to try intermediate measures before "jump[ing] to the conclusion that D.K.'s misbehavior denoted a disability or disorder." *Id. D.K.* stands for the proposition that "schools need not rush to judgment or immediately evaluate every student exhibiting below-average capabilities, especially at a time when young children are developing at different speeds and acclimating to the school environment." *Id.* at 252.

In this case, by contrast, O.W. was not exhibiting behaviors "typical of boys his age." And, unlike D.K., who was a "young child[]" in the early years of elementary school, O.W. was a fifth grader who had already been moved between schools in an attempt to respond to his unique educational needs. By the time the § 504 meeting occurred on October 8, 2014, O.W. had repeatedly: drawn violent pictures depicting murder, death, and anti-Semitic images; used incredibly vulgar language and made lewd gestures in the middle of the classrooms; disrupted class by yelling obscenities; hurled racial slurs and other derogatory insults at the principal, teacher, and fellow students; refused to follow directions or even remain in the classroom; thrown crayons at the teacher; and engaged in other forms of misconduct that resulted in him being removed from the classroom *on a daily basis*. And during this time, the School

No. 18-20274

District had attempted to provide both positive and negative reinforcements, frequent redirections, and consequences for O.W.'s behavior. Yet they had no effect. Based on the severity of O.W.'s behavior, it was not reasonable to try intermediate measures to determine whether special education testing was appropriate for O.W., as was the case for D.K.  The School District was more than reasonably "on notice of acts or behavior likely to indicate a disability" before implementing § 504 accommodations, and it was, therefore, required to evaluate O.W.[12]

In sum, the record in this case reflects that as of the October 8 notice date, the School District had attempted to engage with O.W. and his parents for the purpose of offering positive incentives and that such attempts had utterly failed to improve O.W.'s behavior. This failure led the hearing officer to conclude that "[b]y the October 8, 2014 Section 504 meeting, it was apparent that general education behavioral interventions were not working . . . ." We agree with the hearing officer that by October 8, 2014, the School District should have known that general behavior interventions were not working and that relying exclusively on § 504 accommodations, in lieu of evaluation, would only delay providing O.W. the assistance he needed. Accordingly, we conclude the continued use of behavioral interventions was not a proactive step toward compliance with the School District's child find duties and that, therefore, a child find violation occurred.[13]

---

[12] We, of course, do not suggest that the School District's § 504 plan was unreasonable. It is only to say that, under the circumstances, it was not reasonable for the § 504 plan to be a *preliminary* rather than *concurrent* step in pursuing an evaluation.

[13] The School District has suggested that some of the delay may be attributable to O.W.'s parents' delay in providing information. While a proactive step may include waiting for a reasonable time for a parent to respond to a request for information or approval, *see Woody*, 465 F.3d at 320, "the IDEA imposes the Child Find obligation upon school districts, not the parents of disabled students." *Krawietz*, 900 F.3d at 677.

No. 18-20274

## B. FAPE and IEP

"The IDEA requires states and local educational agencies receiving federal IDEA funds to make a FAPE available to children with certain disabilities." *Renee J., as Next Friend of C.J. v. Hous. Indep. Sch. Dist.*, 913 F.3d 523, 528–29 (5th Cir. 2019) (quotation marks and alterations omitted). "Schools provide students a FAPE based on IEPs unique to each child." *Id.* at 529. An IEP is a "written statement prepared at a meeting attended by a qualified representative of the school district, a teacher, the child's parents or guardians, and when appropriate, the child himself." *Id.* (quoting *Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 989 (5th Cir. 2014)). An IEP must be both adequate in design and properly implemented. *See id.* (IEP must be adequate); *Hous. Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000) (failure to implement IEP may result in violation of IDEA).

The parties do not dispute the IEP developed by the School District was adequate in design.[14] However, the hearing officer found, and the district court agreed, the School District failed to implement O.W.'s IEP because it used time-outs, physical restraints, and police involvement as forms of discipline, and because it improperly shortened O.W.'s school day. The School District challenges each of these conclusions.

### 1. Use of discipline

Ordinarily, adequacy of an IEP is determined by consideration of the four "indicators of whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA," which were set forth in *Cypress-Fairbanks Independent School District v. Michael F. ex rel. Barry F.*, 118 F.3d

---

[14] The district court, in a footnote, noted that the escalating discipline at Ridgecrest was a result of either a failure to implement the IEP or an "inappropriate" IEP. However, the district court's opinion also noted that neither party was challenging the adequacy of the IEP itself. Because the opinion includes no analysis of the relevant factors, it does not appear the district court intended to hold the IEP was inadequate.

245, 253 (5th Cir. 1997). However, when a plaintiff brings a claim based on a failure to *implement* an IEP, the first factor (whether the program is individualized) and second factor (whether the program is administered in the least restrictive environment) are generally "not at issue." *Bobby R.*, 200 F.3d at 348. Rather, a court must decide whether a FAPE was denied by considering, under the third factor, whether there was a "substantial or significant" failure to implement an IEP;[15] and under the fourth factor, whether "there have been demonstrable academic and non-academic benefits from the IEP." *Id.* at 349.

### a. Take 5 and Take 10

The district court found the use of Take 5 and Take 10 violated the IEP because under Texas law, "[t]he use of time-outs must be limited on a student's IEP if they are to be used," and because the procedures were time-outs as they "were mandatory isolations for O.W. away from his regular setting and other students." The district court also found the use of the take-discipline inconsistent with the IEP's general requirement that staff use a calm interaction area, redirect O.W., and remind him of his ability to access a cooling off area.

Texas law provides a "[t]ime-out may only be used in conjunction with an array of positive behavior intervention strategies and techniques and must be included in the student's IEP and/or BIP if it is utilized on a recurrent basis to increase or decrease a targeted behavior." 19 Tex. Admin. Code § 89.1053(g). Thus, an IEP or BIP which does not authorize the recurrent use of time-outs effectively prohibits such use. The parties do not dispute that O.W.'s IEP did

---

[15] *Bobby R.* defined the inquiry as whether a district "failed to implement substantial or significant provisions of the IEP." 200 F.3d at 349. However, the panel focused the substance of its inquiry on whether the violation of the IEP (rather than the provision) was de minimis. *Id.* at 348.

not authorize the use of time-outs,[16] or that the take-discipline was utilized on a recurrent basis to increase or decrease a targeted behavior. However, the School District contends the Take 5 and Take 10 disciplines were not time-outs under Texas law because the desk was in O.W.'s classroom and was not separated from other students and because O.W. was given an opportunity to pursue preferred activities during the discipline.

The code defines a time-out as "a behavior management technique in which . . . the student is separated from other students for a limited period in a setting: (A) that is not locked; and (B) from which the exit is not physically blocked by furniture, a closed door held shut from the outside, or another inanimate object." *Id*. § 89.1053(b)(3). While the School District is correct the desk was in O.W.'s classroom and that O.W. was allowed to partake in preferred activities, nothing in the administrative definition of "time out" suggests the definition is limited to placement in a separate room or is inapplicable when the student is provided certain activities. Section 89.1053(b) only requires a "separat[ion] from other students for a limited period . . . ." Although the parties cite no specific evidence as to the location of the desk, references by school employees to the procedure as an "isolation" or "time-out," while not dispositive, support the district court's finding that the desk was separated from other students. Thus, we conclude the district court did not err in finding the take-disciplines to be timeouts. Because O.W.'s IEP prohibited time-outs, the recurrent use of the take-discipline amounted to a substantial or significant departure from the IEP.

Regarding the fourth factor, the district court found the failure to

---

[16] The School District does not argue the IEP's authorization to "[d]irect [O.W.] to the cool-down area" amounted to an authorization to use time-outs under Texas law. We deem this argument forfeited. *See United States v. Zuniga*, 860 F.3d 276, 284 n.9 (5th Cir. 2017) ("[A]ny issue not raised in an . . . opening brief is forfeited.").

implement the IEP "denied O.W. the educational benefits sought under the IEP, and that such failure denied O.W. a FAPE." We agree. It is undisputed that after the IEP was implemented, O.W.'s grades dropped[17] and his behavior deteriorated to the point where school officials determined his school day should be shortened to three hours. This regression shows neither an educational nor a behavioral benefit. *See generally Hous. Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 583 (5th Cir. 2009) ("[A]n IEP must be likely to produce progress, *not regression . . . .*") (emphasis added).

In sum, the use of the take-discipline was a significant or substantial departure from O.W.'s IEP. During the time period this departure occurred, O.W. regressed both educationally and behaviorally. Under these circumstances, we conclude the district court did not err in finding an actionable failure to implement O.W.'s IEP as to take discipline.

### b. Physical restraints

The district court and the hearing officer found the use of physical restraints violated the IEP's framework for behavioral interventions, which required that staff use a calm style, minimize verbal interactions, avoid power struggles, and provide access to a cooling off period. The School District argues it was entitled under Texas law to use physical restraints and it was not required to include such use in the IEP.

There is no question the use of physical restraints is neither positive reinforcement nor consistent with avoiding confrontations or power struggles. However, Texas law expressly authorizes a local education agency (LEA) to use

---

[17] In arguing O.W.'s grades improved under the IEP, the School District compares O.W.'s scores from the first term (when he started at Nottingham) to his fourth term (when he was mostly at Ridgecrest). When compared in this fashion, the School District is correct that all but one of O.W.'s grades improved. However, when compared to the third term, which ended approximately two weeks before O.W. began at Ridgecrest, the grades dropped in most subjects.

physical restraints in an "Emergency" situation, which is defined as a "situation in which a student's behavior poses a threat of . . . imminent, serious physical harm to the student or others; or . . . imminent, serious property destruction." 19 Tex. Admin. Code § 89.1053(b), (c). Unlike the use of time-outs, the law contains no provision requiring that the use of physical restraints be expressly authorized by a student's IEP.

O.W.'s IEP listed positive reinforcement and avoidance of power struggles as two of seven "Specific strategies/supports to prevent or decrease . . . problem behavior." In addition, the IEP listed five "Strategies/interventions to use when [physical aggression] behavior is occurring:" (1) "Us[ing] a calm interaction style and minimize[ing] verbal interactions;" (2) "Remind[ing O.W.] to use taught coping strategies;" (3) "Direct[ing O.W.] to the cool-down area;" (4) "Provid[ing] more physical space;" and (5) "Remov[ing] extraneous objects so [O.W.] is not tempted to throw them." Nothing in the IEP suggests the LEA was required to follow every strategy in every instance. More important, nothing in the listed strategies suggests the techniques were intended to apply in the specific situation governed by the emergency restraint provision—when there is an imminent threat of serious harm. Therefore, so long as the School District's use of physical restraints complied with state law, the use of restraints did not violate the IEP.

O.W.'s disciplinary records show that he was physically restrained eight times and that each instance of restraint was preceded by violent behavior by O.W. and attempts by district staff to utilize at least some of the strategies enumerated in the IEP. In each instance, the school determined the restraint was necessary to prevent serious physical harm to O.W. or to another. O.W. does not dispute the uses of restraints were necessary to prevent harm and were thus appropriate under Texas law. Accordingly, the district court erred in concluding these eight instances of physical restraints violated O.W.'s IEP.

c.  Police intervention

As with the physical restraints, the district court and the hearing officer determined the request for police intervention violated the IEP, and thus denied O.W. a FAPE, because calls to police were inconsistent with the IEP's expressly authorized strategies of using a calm interaction style, minimizing verbal interactions, providing access to a cooling off period, and avoiding power struggles. We disagree.

As mentioned above, the IEP listed specific strategies to be used to address O.W.'s aggressive behavior. These strategies are not necessarily violated by a mere request for police presence, particularly to deal with a violent and escalating situation such as a student repeatedly striking a teacher and charging at her, as was the case here. O.W. interacted with police officers on one occasion, and only after school officials provided him an opportunity to cool down, offered verbal redirections, provided praise, attempted to reduce verbal interactions, and applied calming techniques. Once the officers arrived, the interaction was limited to a handful of questions which may best be characterized as implicit threats of arrest if O.W. continued to assault his teachers. There is no indication Ridgecrest staff directed or encouraged the police officers to act in a manner inconsistent with the IEP. Because the School District took steps to avoid police interaction and O.W.'s behavior posed a substantial risk of serious injury to himself and others, we do not believe the calls to police were inconsistent with O.W.'s IEP. Accordingly, the single instance of police involvement did not rise to the level of an actionable violation.

### 2.  Modification of IEP

Under Texas law, "[s]tudents with disabilities must have available an instructional day commensurate with that of students without disabilities. The ARD committee must determine the appropriate instructional setting and

length of day for each student, and these must be specified in the student's IEP." 19 Tex. Admin. Code § 89.1075(e). Both the district court and the hearing officer determined that the shortening of O.W.'s school day violated O.W.'s IEP (and thus the IDEA) because the shortened school day was not provided for in O.W.'s IEP. The School District submits the IEP was modified by Ms. W and school officials.

"In making changes to a child's IEP after the annual IEP Team meeting for a school year, the parent of a child with a disability and the public agency may agree not to convene an IEP Team meeting for the purposes of making those changes, and instead may develop a written document to amend or modify the child's current IEP." 34 C.F.R. § 300.324(a)(4)(i). Unless the IEP is modified by agreement in accordance with paragraph (a)(4), it may be modified only "by the entire IEP Team at an IEP Team meeting." *Id*. § 300.324(a)(6).

By its terms, § 300.324(a)(4) provides an agreement may be modified without a meeting when the parent and LEA (1) agree as to the modification; (2) agree not to convene an IEP meeting; and (3) develop a written document to amend or modify the IEP. While the district court and hearing officer focused on the general fact that the IEP was modified to shorten O.W.'s school day, there were two modifications—the initial modification from a 7:30 start time to a 9:00 start time, and the subsequent modification to a three-hour school day.

The initial modification, which included a formal written document prepared by Ms. W. and the LEA that set forth the modification and did not contemplate further IEP team action, satisfies § 300.324(a)(4)'s three requirements. However, the subsequent modification, which did not include a formal written document produced by the parent and the LEA, and which

No. 18-20274

internal documents reflect presupposed a subsequent ARD meeting,[18] did not meet the regulation's requirements. It follows, therefore, that only the initial modification was effective and that the subsequent shortening of O.W.'s school day violated the IEP. This modification, which approximately halved O.W.'s school day, was a substantial and significant deviation from the IEP which indisputably resulted in a loss of academic benefits. Thus, the district court erred in finding the May 6, 2015, modification represented an actionable failure to implement O.W.'s IEP. The district court, however, correctly concluded the May 18, 2015, modification rose to the level of an actionable violation.

## IV. REMEDIES

The "IDEA authorizes reimbursement for the cost of private special-education services when a school district fails to provide a FAPE and the private-school placement is appropriate, regardless of whether the child previously received special education or related services through the public school." *Woody*, 865 F.3d at 314–15. If these requirements are satisfied, the court "must consider all relevant factors, including the notice provided by the parents and the school district's opportunities for evaluating the child, in determining whether reimbursement for some or all of the cost of the child's private education is warranted." *Id.* at 315. However, to the extent this form of reimbursement is dependent on the failure to provide a FAPE, it may not

---

[18] The only written document cited by the School District is an internal e-mail between staff members stating that Ms. W. had agreed to the reduction, which reads:

Kristin and I had a long conversation with the 5th grader's mother. In order to "survive" the last 11 days of school, let's shorten his day from 9 to noon. Ana, this means a brief ARD; know that he will begin this schedule tomorrow. She said she could stay after she drops him off. We will hold an ARD at SFMS before school starts to get him back full day; just FYI. Let us know how you want to handle the brief ARD as in who needs to be there, etc. I will be out to speak to the teacher and para [sic] about some ideas. She said today went well . . . .

extend to periods when no FAPE violation occurred. *See generally id.* at 318 ("[N]o case shown to us has permitted reimbursement for the time period before a school district's obligations under the Act arose."). Put differently, "the right to private school reimbursement, once adjudicated, does not go on indefinitely, but only while the school district is noncompliant (or acknowledges its inability to comply) with its obligation to provide a 'free appropriate public education.'" *Casey K. ex rel. Norman K. v. St. Anne Cmty. High Sch. Dist. No. 302*, 400 F.3d 508, 516 n.1 (7th Cir. 2005).

In contrast, compensatory awards, which may include tuition reimbursement, are designed to provide "services prospectively to compensate for a past deficient program." *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1280 (11th Cir. 2008). Such awards "should place children in the position they would have been in but for the violation of the Act." *Id.* at 1289 (citing *Reid ex rel Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005)).

The hearing officer awarded the cost of one year of compensatory education for the 2016–2017 school year at Fusion because "[i]n the 2014-2015 school year, the School District did not timely fulfill its Child Find Obligation and did not fully implement Student's IEP, denying Student a FAPE." The officer also found the School District should reimburse O.W. for the 2015–2016 school year at Fusion because placement in the School District was inappropriate and placement at Fusion was appropriate. The district court affirmed these decisions.

To the extent the hearing officer and district court awarded tuition reimbursement for a time period for which there was no corresponding finding of an IDEA violation (the 2015–2016 school year), such an award appears to have been in error. Regardless, because we have determined some of the district court's underlying conclusions were incorrect, we remand the remedy

question to the district court for reconsideration in light of this opinion.[19] *See M.M. v. Lafayette Sch. Dist.*, 767 F.3d 842, 862 (9th Cir. 2014) (remanding for reconsideration of remedies following reversal of summary judgment finding).

For the reasons above, we AFFIRM in part, REVERSE in part, and REMAND.

---

[19] We note that "[a]n unreasonable delay in complying with [the Child Find] duty may constitute a procedural violation of the IDEA." *Krawietz*, 900 F.3d at 676 (internal quotation marks and citation omitted). "In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free public education only if the procedural inadequacies—(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free public education to the parents' child; or (III) caused a deprivation of education benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).