# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 17, 2021

Lyle W. Cayce
Clerk

No. 20-20339

D.C., *an individual with a disability*; J.C., *as parent/guardian/next friends of* D.C., *an individual with a disability*; K.C., *as parent/guardian/next friends of* D.C., *an individual with a disability*,

*Plaintiffs—Appellees*,

*versus*

Klein Independent School District,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-21

Before Haynes, Graves, and Willett, *Circuit Judges*.

Haynes, *Circuit Judge*:*

This case was brought on behalf of D.C., a minor with a specific learning disability in reading comprehension. Soon after D.C. started first grade in the Klein Independent School District (the "District"), his teachers

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

realized that he struggled with reading comprehension and fluency. By the end of second grade, school officials recognized that D.C. was "in need of intensive intervention" due to his reading deficiencies. Although the District provided D.C. with increasing accommodations, his grades and test scores continued to decline in some respects. Finally, in fifth grade, the District evaluated D.C. and determined that he was eligible to receive special education. Yet, when District officials met with D.C.'s parents to draft a special education program, they failed to provide D.C. with any specialized instruction in reading comprehension. Once the program was implemented, D.C. showed only marginal improvements in his reading ability and remained well below grade-level.

Dissatisfied with the District's program, D.C.'s parents sued the District on D.C.'s behalf under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. §§ 1400–82. There are two key questions remaining in this lawsuit: (1) did the District unreasonably delay evaluating D.C. for special education eligibility; and (2) did the District fail to provide D.C. with an adequate special education program? So far, a state hearing officer, a magistrate judge, and a district court have unanimously answered each question, "Yes." We agree, and therefore AFFIRM.

## I.    Background

### A.    The IDEA's Statutory Structure

The IDEA provides that in exchange for "federal funds to assist in educating children with disabilities," "a State pledges to comply with a number of statutory conditions." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017). Chief among these conditions is the requirement to provide a free appropriate public education ("FAPE") "to all children with disabilities residing in the State between the ages of 3 and 21." 20 U.S.C. § 1412(a)(1)(A). Under the IDEA, a FAPE "consists of

No. 20-20339

educational instruction specially designed to meet the unique needs of the . . . child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 188–89 (1982).

The IDEA provides a comprehensive scheme to ensure that every eligible child is provided a FAPE. This scheme begins with the "child find" mandate, which requires each state to "identif[y], locate[], and evaluate[]" each resident child with disabilities "who [is] in need of special education and related services." 20 U.S.C. § 1412(a)(3)(A). Once an eligible child is identified, the IDEA requires preparation of an Individual Education Plan ("IEP") "tailored to the unique needs of" the child. *Rowley*, 458 U.S. at 181. The "IEP must be drafted in compliance with a detailed set of procedures," which "emphasize collaboration among parents and educators." *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1414). Further, "[e]ach IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (citing 20 U.S.C. § 1414(d)(1)(A)). Ultimately, "a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999.

If the collaborative IEP-drafting process breaks down, the IDEA offers a detailed dispute-resolution process. *See* 20 U.S.C. § 1415. As relevant here, "the parents or the local educational agency involved" may request an "impartial due process hearing," the exact procedures of which are determined by state law. *Id.* § 1415(f)(1)(A). At the conclusion of the state administrative process, any aggrieved party may seek relief in state or federal court. *Id.* § 1415(i)(2)(A). Additionally, a federal court may award attorneys'

fees to the parents if they are the "prevailing party" in the litigation. *Id.* § 1415(i)(3)(B)(i)(I).

### B.     D.C.'s Experience in the District

During first through fourth grade, D.C. struggled with reading comprehension and fluency.    The District recognized that D.C. was struggling, and attempted to address his issues through means other than special education.[1]   When he was in third grade, his mother requested a special education evaluation from the school.  After reviewing D.C.'s file, the District's Referral Committee concluded that D.C. did not appear to be in need of special education.   However, on March 22, 2016, the District's Section 504 Student Review Committee convened and determined that D.C. had a disability under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, warranting a number of instructional accommodations.    These accommodations included: not requiring D.C. to read aloud, providing extra time for assignments, permitting frequent breaks, and allowing oral administration of assignments and tests.

On September 3, 2017, just before the start of D.C.'s fifth grade year, D.C.'s parents again requested a special education evaluation.  On October 19, 2017, the District's Referral Committee met with D.C.'s mother and, with her consent, referred him for evaluation.  The evaluation was completed on January 14, 2018, concluding that D.C. had a specific learning disability in reading comprehension.

The District's Admission, Review, and Dismissal ("ARD") Committee met with D.C.'s parents on February 7, 2018 to review the results

---

[1] Specifically, starting in first grade, the District placed D.C. in the "Language Literacy Intervention" program, which focused on reading comprehension and writing skills.

of the evaluation and to formulate an IEP. After three days of meetings (February 7, March 1, and March 9), the ARD Committee prepared an IEP for D.C.; D.C.'s parents signed the IEP and agreed to its immediate implementation. D.C.'s IEP recognized that he had a "Specific Learning Disability in the area of Reading Comprehension, Reading Fluency, Basic Reading Skill," and, at the insistence of D.C.'s family, identified him as a "student with Dyslexia." The IEP placed D.C. in general education for all of his classes, but offered two major special services: (1) 3.75 hours per week of co-teach reading instruction, and (2) dyslexia services.

## C.    The Due Process Hearing

D.C.'s parents filed a due process complaint with the Texas Education Agency on April 27, 2018. A hearing was held in August 2018, and the hearing officer issued his decision in November 2018. Based on his review of the evidence, the hearing officer determined that D.C. had a specific learning disability in reading comprehension and that his "reading comprehension deficit [was] the root of his issues with reading fluency and his primary area of need."

The hearing officer then concluded that the District had denied D.C. a FAPE by violating its child find duty and by failing to prepare an adequate IEP. With respect to child find, the hearing officer found that the District had reason to suspect D.C. was eligible for special education by April 27, 2017, and had unreasonably delayed evaluating him until January 2018.[2]

---

[2] The hearing officer set April 27, 2017 as the trigger date rather than an earlier date because he determined that April 27, 2017 was the beginning of the relevant statute of limitations period. The district court accepted the hearing officer's determination regarding the statute of limitations, and D.C. does not raise the issue on appeal.

No. 20-20339

With respect to the adequacy of the IEP, the hearing officer found that: (1) the IEP was not individualized because it did not provide D.C. with a specialized program to address his reading comprehension disability, instead providing D.C. with dyslexia services, even though there was insufficient evidence that D.C. was dyslexic; (2) the IEP did provide services in the least-restrictive environment; (3) the IEP did not provide services in a collaborative manner; and (4) the IEP did not provide D.C. with sufficient academic benefit as he made only minimal progress in reading. Accordingly, the hearing officer ruled that the District had not provided D.C. with a FAPE.

Based on these findings, the hearing officer ordered the District to modify the IEP so as to provide D.C. with forty-five minutes per day of reading instruction using either Read 180, a research-based reading comprehension program, or a similar peer-reviewed program. The hearing officer also awarded D.C. 108 hours of compensatory education.

## D.    District Court Proceedings

In January 2019, D.C.'s parents filed suit in federal district court, seeking attorneys' fees and costs as the prevailing party in the state administrative proceedings. The District counterclaimed, asserting that D.C. was not a prevailing party because the hearing officer's decision was erroneous. The District also sought reversal of the hearing officer's award of compensatory education.

D.C. and the District filed cross-motions for summary judgment.[3] The magistrate judge reviewed these motions and recommended that the

---

[3] In IDEA cases, if "neither party request[s] the district court hear additional evidence, a summary judgment motion is the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *R.S. ex rel. Ruth B. v. Highland Park Indep. Sch. Dist.*, 951 F.3d 319, 327 n.6 (5th Cir. 2020) (per curiam) (internal quotation marks and citation omitted).

district court grant D.C.'s motion and deny the District's. The District timely objected to the magistrate judge's recommendations.

Although the district court agreed with the District that the magistrate judge had applied an incorrect standard of review, it concluded that this error was not dispositive. Accordingly, the district court modified the magistrate judge's report and recommendation to apply the correct standard of review, but otherwise adopted it in full. In its memorandum order, the district court agreed with the hearing officer's conclusions regarding child find, found that D.C.'s IEP was inadequate because it was not appropriately individualized and did not provide a demonstrated meaningful benefit, and awarded D.C. attorneys' fees. The District timely appealed.

## II.    Standard of Review

Whether a school district complied with the child find mandate and whether a school district provided a child with a FAPE are mixed questions of law and fact. *Spring Branch Indep. Sch. Dist. v. O.W. ex rel. Hannah W.*, 961 F.3d 781, 790 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1389 (2021) (mem.). Accordingly, a district court's legal conclusions are reviewed de novo, while its findings of fact are reviewed for clear error. *Id.* On clear error review, we will reverse a district court's findings only if we are "left with the definite and firm conviction that a mistake has been committed." *E.R. ex rel. E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 766 (5th Cir. 2018) (per curiam) (internal quotation marks and citation omitted).

"[A] federal district court's review of a state hearing officer's [IDEA] decision is virtually de novo." *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir. 2003) (internal quotation marks and citation omitted). Under this standard, a district court should give "due weight" to a hearing officer's findings, but "must arrive at an independent conclusion based on a preponderance of the evidence." *Id.* (internal

quotation marks and citation omitted). However, a district court must afford "greater deference" to credibility determinations based on live testimony.[4] *Lisa M. v. Leander Indep. Sch. Dist.*, 924 F.3d 205, 218 (5th Cir. 2019) (quotation omitted).

## III.    Discussion

On appeal, the District challenges four aspects of the district court's judgment: (1) the finding that the District violated the child find mandate; (2) the finding that D.C.'s IEP was inadequate; (3) the decision not to vacate the hearing officer's award of compensatory education; and (4) the conclusion that D.C. was an prevailing party eligible to receive attorneys' fees. We address each issue in turn.[5]

---

[4] As we undertake our review, we are mindful that the Supreme Court has repeatedly warned lower courts against mistaking the IDEA's broad standards "for 'an invitation . . . to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Endrew F.*, 137 S. Ct. at 1001 (quoting *Rowley*, 458 U.S. at 206).

[5] In its reply brief, the District makes the overarching argument that the district court improperly placed the burden of persuasion on it rather than on D.C. But this argument does not appear in the District's opening brief, which makes only vague assertions that the *hearing officer* improperly allocated the burden of persuasion at the *administrative level*. We detect no error in the hearing officer's allocation of the burden of persuasion, and because the District did not raise the issue of the district court's allegedly improper allocation until its reply brief, the issue has been waived. *See, e.g.*, *United States v. Jackson*, 426 F.3d 301, 304 n.2 (5th Cir. 2005) (per curiam) (noting that arguments raised for the first time in a reply brief are waived). Moreover, the District's reply brief neither cites any of our precedents specifying how the burden of persuasion is allocated at the district court level, nor explains what the appropriate remedy would be for the district court's supposed burden-of-persuasion error, nor even cites to the allegedly erroneous portions of the district court's memorandum order. Thus, even if we ignored the District's failure to raise the issue in its opening brief, the argument would still be waived. *See Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 735 (5th Cir. 2018) ("To avoid waiver, a party must identify relevant legal standards and any relevant Fifth Circuit cases." (quotation omitted)); *United States v. Upton*, 91 F.3d 677, 684 n.10 (1996) ("[C]laims made without citation to authority or references to the record are

No. 20-20339

### A.    Child Find

We have held that the IDEA's child find mandate has an implied "reasonable time" requirement, such that "a school district must identify, locate, and evaluate students with suspected disabilities within a reasonable time after the school district is on notice of facts or behavior likely to indicate a disability." *O.W.*, 961 F.3d at 791 (internal quotation marks and citation omitted).   When considering whether a school district acted within a reasonable time, we "employ a case-by-case approach" and consider only "the information and resources possessed by the district at a given point in time." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 272 (3d Cir. 2012) (internal quotation marks and citation omitted); *see also Lisa M.*, 924 F.3d at 214 (stressing that it is inappropriate to consider hindsight evidence when reviewing an IDEA eligibility determination).  Ultimately, our evaluation of a school district's compliance with the child find mandate "turns on three inquiries: (1) the date the child find requirement [was] triggered due to notice of a likely disability; (2) the date the child find duty was ultimately satisfied; and (3) the reasonableness of the delay between these two dates." *O.W.*, 961 F.3d at 793.

The district court determined that: (1) the District's child find duty was triggered by April 27, 2017; (2) the District satisfied its obligations on October 19, 2017, when D.C.'s mother consented to a disability evaluation; and (3) that the nearly six-month delay between these dates was unreasonable.  On appeal, the District asserts that the district court erred in concluding that April 27, 2017 was the trigger date, and that even if April 27

---

considered abandoned on appeal."); Fᴇᴅ. R. Aᴘᴘ. P. 28(a)(8)(A) (requiring the appellant to provide "citations to the authorities and parts of the record on which the appellant relies").

was the correct trigger date, its delay was reasonable. Neither assertion is persuasive.

### 1.     Trigger Date

A school district's child find duty is triggered when the district "had reason to suspect [the child] had a qualifying disability." *Dall. Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 320 (5th Cir. 2017). Although there is no bright-line rule, a school district generally has sufficient notice if it is aware of facts suggesting the child has a disability and that the child is struggling academically. *Compare Krawietz ex rel. Parker v. Galveston Indep. Sch. Dist.*, 900 F.3d 673, 677 (5th Cir. 2018) (concluding that a child's "academic decline, hospitalization, and incidents of theft should have led [the school district] to suspect her need for special education services" (internal quotation marks omitted)), *with D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 251 (3d Cir. 2012) (determining that the school district's child find obligation was not triggered where the child's adverse behaviors were consistent with his age group and he was achieving "intermittent progress and even academic success"), *and Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 314 (6th Cir. 2007) (determining that the school district did not violate the child find mandate where the child was "meeting expectations in all academic areas" despite displaying significant behavioral issues).

As the district court noted, there was extensive evidence that the District was or should have been aware of D.C.'s disability by April 27, 2017, including: his fourth-grade Section 504 plan, which noted he had "secondary characteristics of dyslexia evident in reading comprehension and written expression"; his third-grade Section 504 plan, which stated that D.C. had a substantial impairment; and the fact that D.C.'s performance on assignments substantially improved with oral administration. By that point, the District also possessed substantial evidence that D.C.'s disability warranted special

education.  In particular, despite the District's provision of Section 504 accommodations, D.C.'s reading level did not improve from the start of fourth grade through the middle of the year, he scored a mere forty percent during a February simulation for the State of Texas Assessments of Academic Readiness ("STAAR") exam, and, most concerningly, he placed in the second percentile on his winter reading Measure of Academic Proficiency ("MAP") test, despite having placed in the forty-second percentile in the fall.  Given the failure of the Section 504 accommodations to improve D.C.'s performance, by April 27, 2017, the District should have been aware that its existing strategy was insufficient to serve D.C.'s needs. *Cf. L.M.*, 478 F.3d at 314 (concluding that the school district did not violate child find where interventions short of special education "were moderately successful").  Consequently, the district court did not err in its trigger date determination.

### 2.    Reasonableness of the Delay

In *O.W.*, we established "that the reasonableness of a delay is not defined by its length but by the steps taken by the district during the relevant period."  961 F.3d at 793.  Accordingly, we consider whether, "throughout the period between notice and referral, a district t[ook] proactive steps to comply with its child find duty."  *Id.*  For example, in *Woody*, we held that a three-month delay was reasonable where the school district spent the intervening period "requesting and gathering information," the child's parent took over a month to respond to an information request, and the parent and the district mutually agreed to hold the referral meeting an additional month later.  865 F.3d at 320.  By contrast, in *O.W.*, we held that a three-month and seven-day delay was unreasonable where the school district chose to continue implementing Section 504 accommodations instead of pursuing a special education evaluation.  961 F.3d at 793–95; *see also Krawietz*, 900 F.3d at 677 (ruling that a four-month delay was

unreasonable where the district "failed to take any appreciable steps toward complying with its Child Find obligations").

Here, the District concedes that it failed to take any steps towards evaluating D.C. between April 27 and the start of the new school year on September 6, 2017. Nevertheless, the District argues that these months should not count against it because this time period included the District's summer vacation. On this point, the District cites a single case, *J.G. v. Douglas County School District*, 552 F.3d 786 (9th Cir. 2008), which adopted a sensible rule: "school districts [are allowed] a degree of leeway during summer vacation," but are not permitted to delay complying with the child find mandate "solely because summer vacation makes a timely evaluation difficult." *Id.* at 798.

Thus, even if we apply the District's preferred rule of law, its summertime delay was unreasonable: school districts on summer break need not move towards evaluation as expeditiously as they might during the school year, but they cannot get away with doing nothing, and here, the District did nothing.[6] Moreover, the District inexplicably ignores its delay during the

---

[6] The District also contends that Texas regulations establish that only school days count when considering whether a school district complied with the child find mandate. Yet, the regulation the District cites, 19 Texas Administrative Code § 89.1011(c)(1), does no such thing. Rather, § 89.1011(c)(1) establishes that school districts have forty-five school days to evaluate a child *following* the receipt of parental consent (received here on October 19, 2017)—the regulation says nothing about how to measure time *before* the receipt of parental consent, which is the relevant issue in this case. We decline the District's invitation to fail to apply the text as written and instead expand the scope of § 89.1011(c) so as to negate pre-consent delays. *See Tex. Dep't of Crim. Justice v. Rangel*, 595 S.W. 3d 198, 210 (Tex. 2020) (explaining that courts "may not impose [their] own judicial meaning on a statute by adding words not contained in the statute's language" (quotation omitted)); *Ebert v. Poston*, 266 U.S. 548, 554 (1926) ("A casus omissus does not justify judicial legislation.").

month of May, when school was in session.[7]    Therefore, the District unreasonably delayed D.C.'s evaluation by at least four months.

The district court further faulted the District for an unnecessary delay between September 3, 2017, when D.C.'s parents requested a special education evaluation, and October 19, 2017, when the District obtained their consent to perform an evaluation.    On this front, the evidence is more equivocal: on the one hand, the District used this time to gather and review its files on D.C. in preparation for the evaluation referral meeting; on the other hand, the District took thirty school days to offer D.C.'s parents an opportunity to consent to an evaluation after receiving their request, whereas Texas law allowed it only fifteen, 19 TEX. ADMIN. CODE § 89.1011(b) (2017) (Tex. Educ. Agency, Full Individual and Initial Evaluation).    But regardless of how we evaluate the District's actions in September and October, the district court's ultimate conclusion remains sound given the unreasonableness of the District's delay between May and September.[8]    *See Krawietz*, 900 F.3d at 677 (affirming the district court's finding of a child find violation even on the assumption that the district court overstated the length of the school district's delay by two months).    Therefore, the district court did not err in determining that the District violated the child find mandate.

---

[7] The school year ended on June 1, 2017.

[8] Although the District does not rely on it, we note that on or before May 1, 2017, D.C.'s fourth-grade teacher implemented a new reading program for him.  Yet, even if this action counts as a proactive step towards compliance in response to D.C.'s winter MAP score, the bottom-line result remains the same: when D.C.'s uniformly below-grade-level STAAR results were released in June, the District should have taken additional steps, but failed to do so.

No. 20-20339

### B.    IEP Adequacy

When reviewing an IEP, "the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 137 S. Ct. at 999.  To evaluate the reasonableness of an IEP, we rely on the four-factor inquiry set forth in *Cypress-Fairbanks Independent School District v. Michael F. ex rel. Barry F.*, 118 F.3d 245 (5th Cir. 1997).  *E.R.*, 909 F.3d at 765 (confirming that the *Michael F.* test was not displaced by the Supreme Court's decision in *Endrew F.*).  Under *Michael F.*, we consider whether: "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated."  118 F.3d at 253.  Ultimately, "a student's IEP need not be the best possible one, nor one that will maximize the child's educational potential; rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction." *A.A. v. Northside Indep. Sch. Dist.*, 951 F.3d 678, 691 (5th Cir. 2020) (internal quotation marks and citation omitted).

The district court determined that the District had collaborated with D.C.'s parents when developing the IEP, but that the March 2018 IEP was not individualized and failed to meaningfully benefit D.C.  It also determined that the least-restrictive-environment *Michael F.* factor was not at issue here.  Accordingly, the district court concluded that the balance of the *Michael F.* factors indicated that D.C.'s IEP was inadequate.

The District challenges the district court's conclusions regarding the individualization and demonstrated benefits factors.  As these conclusions were findings of fact, we review them for clear error. *R.S. ex rel. Ruth B. v.*

*Highland Park Indep. Sch. Dist.*, 951 F.3d 319, 328, 333 (5th Cir. 2020) (per curiam); *Richardson Indep. Sch. Dist. v. Michael Z*, 580 F.3d 286, 295 (5th Cir. 2009). The District also asserts that the district court legally erred by under-weighing the collaboration factor and disregarding the least-restrictive-environment factor. We review this challenge de novo. *O.W.*, 961 F.3d at 790.

### 1.    **Individualization**

An IEP is sufficiently individualized if it is "designed for [the child's] unique needs." *E.R.*, 909 F.3d at 768. Hence, an IEP must provide services that address all of the child's disabilities; significant services addressing one disability are not enough if another disability is left unaddressed. *See Hous. Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 585 (5th Cir. 2009) (concluding that an IEP was not adequately individualized where it "was good for [the child]'s expressive language delay problems" but "was inappropriate to address her auditory-processing disorder").

D.C.'s IEP offered two main services to address D.C.'s disability: (1) co-teach reading services, and (2) dyslexia services. However, as the hearing officer and the district court found, there was insufficient evidence that D.C. had dyslexia, meaning that the dyslexia services offered by the District did not address D.C.'s needs. Therefore, this factor turns on whether the co-teach reading services were an "appropriately ambitious" intervention for D.C.'s reading comprehension disability. *Endrew F.*, 137 S. Ct. at 1000.

The district court did not clearly err in concluding otherwise. Under the co-teach program, a "co-teacher" worked alongside D.C.'s general education teacher for forty-five minutes per day to "giv[e] [D.C.] all of th[e] supports so that he c[ould] successfully access the curriculum." Therefore,

as the hearing officer found, the co-teach program served to "accommodate but not remediate [D.C.]'s reading comprehension issues."

Perhaps, in some circumstances, mere accommodation is an acceptable goal because that is all that may be reasonably attained. *See Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 398 (5th Cir. 2012) (noting that "overall educational benefit, not solely disability remediation, is IDEA's statutory goal"). But D.C. was capable of improvement: as the District's own expert testified, the "ideal option" for D.C. would have been Read 180, a program designed to improve reading comprehension skills. Yet, even though the District had this program in its repertoire, it included neither Read 180 nor any similar program in D.C.'s IEP.[9]

Finally, our decision in *Hovem* does not undermine the district court's conclusion. In that case, the child had several disabilities relating to his writing skills. *Id.* at 392. Although the programs provided under his IEPs failed to fully remediate his writing deficiencies, *Hovem* held that his IEPs were "sufficiently individualized" because they provided him adequate accommodations to advance through the general education curriculum. *Id.* at 398. But the child in *Hovem* was placed in remedial English and writing classes to address his specific writing disability, *id.* at 392–93, and his writing ability improved over time, *id.* at 398. Thus, the IEPs in *Hovem* did at least attempt to remediate the child's writing deficiencies, and consequently, the

---

[9] It is unclear if D.C. continued in the Language Literacy Intervention program after his IEP was implemented; in any event, his IEP makes no mention of it. However, even if the program had been included in D.C.'s IEP, our conclusion would not change: D.C. had been enrolled in this program since first grade, and his reading level had plateaued in fourth grade. Given this plateau, the record suggests that D.C. had needs left unaddressed by the Language Literacy Intervention program. Therefore, an IEP that offered only this program would not have been "designed for [D.C.]'s unique needs." *E.R.*, 909 F.3d at 768.

case simply reflects the well-established rule that an IEP need only "*aim* to enable the child to make progress." *Endrew F.*, 137 S. Ct. at 999 (emphasis added).

By contrast, D.C.'s IEP did not provide any specific program to address D.C.'s reading comprehension learning disability; unlike the IEP in *Hovem*, which at least aimed for improvement, D.C.'s IEP did not.

### 2.    Demonstrated Benefits

To demonstrate positive benefits under *Michael F.*, an IEP must "produce progress, not regression or trivial educational advancement." *E.R.*, 909 F.3d at 765 (internal quotation marks and citations omitted). That is, the demonstrated educational benefit "must be meaningful." *Michael F.*, 118 F.3d at 248 (internal quotation marks and citation omitted); *see also Endrew F.*, 137 S. Ct. at 1000 (noting that the IEP-adequacy standard "is markedly more demanding than [a] 'merely more than *de minimis*' test").

Whether a child is able to pass general education classes and whether a child's test scores have increased are important indicators of whether a child has received a meaningful benefit. *See Hous. Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349–50 (5th Cir. 2000) (relying on these indicators). Here, after his IEP was implemented, D.C. passed all of his fifth-grade general education classes and his performance on several tests improved. However, contrary to the District's assertions, these results do not compel reversal.

To start, the fact that D.C. passed all of his classes is not especially significant, as the Supreme Court has specifically rejected the proposition that a child is receiving a FAPE simply because he is "advancing from grade to grade." *Endrew F.*, 137 S. Ct. at 1000 n.2 (quoting *Rowley*, 458 U.S. at 203 n.25). Moreover, we have held that the development of a child with disabilities "should be measured . . . with respect to the individual student." *Bobby R.*, 200 F.3d at 349. In this case, D.C. had never failed any of his

classes, and his reading grade actually declined in fifth grade to a 77 from a 79 in fourth grade. Thus, measured against his past performance, D.C.'s grades did not meaningfully improve.

Similarly, D.C.'s test results did not demonstrate a meaningful benefit. We have three relevant precedents on this issue: *Bobby R.*, *Hovem*, and *V.P.* In *Bobby R.*, we held that the district court did not clearly err in finding that the child benefitted from his IEP because his absolute test scores increased across his subjects, even though his percentile scores declined. 200 F.3d at 349–50, 349 n.3. Going a step further, in *Hovem*, we held, on de novo review,[10] that the child had meaningfully benefitted from his IEP because he had "obtained a high school level education that would have been sufficient for graduation." 690 F.3d at 399. However, we stressed that the child had been able to "measure up to ordinary grade-level standards," *id.*; indeed, the child had consistently "excel[led]" in school, earning "above-average grades" in his general education classes, *id.* at 391, 393. By contrast, in *V.P.*, we held that the district court did not clearly err in determining that the child had not benefitted from her IEP where her improved test scores were due to "unapproved deviations from [her] IEP," meaning that there was no acceptable evidence that the child was actually progressing due to her IEP. 582 F.3d at 590–91.

---

[10] *Hovem* reviewed the district court's factual findings de novo because it concluded that the district court had applied an incorrect legal standard. 690 F.3d at 397, 399–400. We are uncertain that this was the correct approach. *See Veasey v. Abbott*, 830 F.3d 216, 229 (5th Cir. 2016) (en banc) (explaining that, where a district court's fact-finding was premised on a legal error, the proper remedy is to vacate and remand "unless the record permits only one resolution of the factual issues" (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982))). Because it is immaterial here, we leave the issue of *Hovem*'s continuing viability to another day.

After his IEP was implemented, D.C.'s STAAR reading score improved but remained below grade level; his reading fluency score marginally increased,[11] but was still well below the grade level expectation; and his reading MAP score improved to just below average. The most pronounced improvement came on the STAAR exam, but, as the district court noted, because the District provided D.C. with an additional accommodation on his fifth grade STAAR exam that he did not have in fourth grade, it is unclear whether D.C.'s improved score was attributable to an increase in his reading ability or merely due to his changed testing conditions. Consequently, as in *V.P.*, D.C.'s STAAR results were not reliable evidence of a benefit stemming from the IEP.

Even if the STAAR results are not discounted, D.C.'s test scores do not present the sort of strong evidence of improvement that we relied on in *Hovem* and *Bobby R.* Unlike the child in *Hovem*, D.C. was not consistently meeting grade-level expectations, as his reading fluency and STAAR results were below grade level. Further, although there was some improvement, such improvement was paltry compared to *Bobby R.*, where the district court's finding of demonstrated benefits was supported by increased scores in at least ten different areas. 200 F.3d at 349–50, 349 n.3; *see also Michael Z*, 580 F.3d at 295 (affirming the district court's finding that the child "received minimal educational benefits" despite "a few isolated instances of arguable academic success"). Accordingly, in light of our precedents and the evidence in the record,[12] we cannot say that the district court clearly erred in

---

[11] Specifically, D.C.'s reading fluency improved from 75 to 80 words correct per minute ("wcpm")—at least 38 wcpm below the grade level expectation of 118–27 wcpm.

[12] In addition to D.C.'s grades and test scores, the District emphasizes the testimony of D.C.'s teacher that, by the end of fifth grade, D.C. was able to read aloud with confidence. Because the teacher's perception of D.C.'s confidence is entirely subjective, this evidence is of limited value. *See D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 563, 568

concluding that D.C. did not receive meaningful demonstrated benefits from his IEP.

### 3.    Collaboration and Least Restrictive Environment

We have repeatedly emphasized that district courts do "not legally err by affording more or less weight to particular *Michael F.* factors." *Id.* at 294; *accord R.S.*, 951 F.3d at 330. We have also explained that "district courts are [not] required to consider" these factors at all, so long as their analysis comports with the substantive standard set forth by the Supreme Court. *Michael Z*, 580 F.3d at 293; *see also Michael F.*, 118 F.3d at 253 (explaining that the "four factors *can serve* as indicators of whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA" (emphasis added)).

Given these precedents, the district court did not legally err in its treatment of the collaboration and least-restrictive-environment factors. It was well within the district court's prerogative to conclude that the District's efforts to collaborate with D.C.'s parents did not outweigh its failure to provide him with an individualized IEP and the absence of meaningful demonstrated benefits. It was also permissible for the district court to conclude that the least-restrictive-environment factor was not at issue because neither party disputed that general education was the appropriate environment for D.C. *See Michael Z*, 580 F.3d at 293–95 (affirming the district court's conclusion that the IEP was inadequate where the district

---

(3d Cir. 2010) (concluding that the hearing officer appropriately discounted "subjective" measures of academic performance). Moreover, the District points to nothing in the record establishing that the ability to read aloud is a dispositive indicator of a child's reading comprehension ability; for example, a child might enthusiastically read aloud from a text written in a foreign language without understanding a single word. Thus, this testimony does not undermine the district court's conclusion.

court did not address the least-restrictive-environment factor because the child's parents did not dispute it); *cf., e.g.*, *Brillon v. Klein Indep. Sch. Dist.*, 100 F. App'x 309, 311–15 (5th Cir. 2004) (per curiam) (extensively discussing the least-restrictive-environment factor where the child's parents sought to move the child into general education classes from special education).

To sum up, the district court did not clearly err in concluding that the IEP was not individualized and did not provide demonstrated benefits, did not err in concluding that the least-restrictive-environment factor was not at issue, and did not err in concluding the balance of the factors favored D.C. Accordingly, we AFFIRM the district court's conclusion that the District denied D.C. a FAPE by providing him with an inadequate IEP.

## C.    Compensatory Education

The District also appeals the district court's denial of its counterclaim to vacate the hearing officer's award of compensatory education to D.C. However, D.C. maintains that the issue is moot because the District has already provided the full amount of the compensatory education award, and there is no way to take it back.[13] Because mootness goes to our subject-matter jurisdiction, we must resolve this issue before proceeding further. *Goldin v. Bartholow*, 166 F.3d 710, 718 (5th Cir. 1999) ("We have no power under Article III to decide the merits of a case that is moot when it comes before us.").

A claim becomes moot "[i]f an intervening event renders the court unable to grant the litigant 'any effectual relief whatever.'" *Dierlam v. Trump*, 977 F.3d 471, 476 (5th Cir. 2020) (quoting *Calderon v. Moore*, 518 U.S.

---

[13] During the pendency of the proceedings before the district court, the District began providing D.C. with the awarded compensatory education.

149, 150 (1996)), *cert. denied*, 141 S. Ct. 1392 (2021) (mem.). So, typically, if the plaintiff represents to a court that it is no longer seeking relief on its claim, the case is moot. *See Patriot Cinemas, Inc. v. Gen. Cinemas Corp.*, 834 F.2d 208, 211–15 (1st Cir. 1987) (concluding that an appeal was moot as to the issue of whether to remand a claim to state court because the plaintiff had represented to the state court that it would not pursue that claim regardless of the result of the federal appeal and was therefore judicially estopped from pursuing that claim); 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3533.2 (3d ed. 1998) ("There can be no doubt that an action is mooted if the plaintiff voluntarily withdraws."). Similarly, if the defendant credibly pledges to the court that it will provide the plaintiff's requested relief, the case is moot. *See Lee ex rel. MacMillan v. Biloxi Sch. Dist.*, 963 F.2d 837, 839 (5th Cir. 1992) (concluding that the case was moot because the defendant had committed to providing the plaintiff with her requested relief). *But see Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (explaining that "a defendant's voluntary cessation of a challenged practice" will moot a case only if the defendant carries "[t]he heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again" (internal quotation marks, alteration, and citations omitted)).

Interestingly, this case falls into both of these buckets: When the District filed its counterclaim, it had not yet provided D.C. with the full amount of the compensatory education award, so if the district court had entered judgment in favor of the District and vacated the hearing officer's award, the District would have been relieved of the burden of providing some portion of the award. But, at oral argument, both sides seemed to agree that the District has now provided D.C. with the entirety of the compensatory

No. 20-20339

education award.[14]  Therefore, D.C. has credibly relinquished any claim to additional compensatory education, thereby providing the District with the substantive relief it sought—to be relieved of the burden of continuing to administer compensatory education to D.C.  That is, no matter whether one views D.C. as the plaintiff or the defendant on the compensatory education issue,[15] D.C.'s representations to us are enough to render the issue moot.  *See Patriot Cinemas*, 834 F.2d at 211–15; *Lee*, 963 F.2d at 839.

Further, the District has expressly conceded that compensatory education cannot be disgorged.  Consequently, there is apparently no dispute that if we were to vacate the hearing officer's award of compensatory education, there would be no substantive change in the parties' relationship and no gain provided to the District

So, the only remaining question is whether ordering vacatur provides "effectual relief" even if the vacatur would not change the relationship

---

[14] D.C. stated that all of the awarded compensatory education "was provided," and he disclaimed any interest in the provision of additional compensatory education.  When the District was asked about the issue, it declined to represent that any hours of compensatory education remain outstanding, instead invoking the "capable of repetition, yet evading review" exception to mootness, and arguing that the compensatory education issue is material to the issue of whether D.C. was entitled to attorneys' fees.  Even if the District did not affirmatively agree with D.C.'s position that all of the awarded compensatory education has been provided, the District has abandoned any argument to the contrary by failing to assert such an argument despite our direct questioning.  *See NAACP v. City of Kyle*, 626 F.3d 233, 236 & n.2 (5th Cir. 2010) (explaining that the plaintiffs had apparently abandoned their associational-standing claim by failing to invoke it when directly questioned at oral argument).

[15] Such a determination is complicated because D.C. and the District have each played the role of plaintiff on this issue at different points in this litigation: D.C. was the plaintiff in the administrative hearing, but the District is the (counterclaim) plaintiff in the present federal lawsuit.  Regardless of how the roles are assigned, given the intervening events, we are confident that we can no longer grant either party any effectual relief regarding the compensatory education award.

between the parties. The answer is "No"; once the parties have lost their "concrete interest" in the litigation, the case is moot. *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307–08 (2012) (internal quotation marks and citation omitted). Indeed, if the contrary were true, it would be impossible for any case to become moot on appeal, as there is always an underlying judgment adverse to one of the parties that might be vacated. Yet, it is not impossible for cases to become moot on appeal. *E.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1526 (2020) (per curiam). Therefore, vacatur is not an effectual form of relief in-and-of itself.

In the closing minutes of oral argument, the District attempted to invoke the "capable of repetition, yet evading review" exception to mootness. Because the District did not present this argument in its briefing, it has been waived. *See, e.g.*, *Cornucopia Inst. v. USDA*, 560 F.3d 673, 675 n.3 (7th Cir. 2009) ("At oral argument, Cornucopia made brief reference to the 'capable of repetition yet evading review' exception to the mootness doctrine. However, Cornucopia has waived this argument by failing to raise it in its briefs."); *M.L. v. El Paso Indep. Sch. Dist.*, 369 F. App'x 573, 577 n.6 (5th Cir. 2010) (per curiam) ("In his brief, Appellant did not argue that his claims were saved by any exception to the doctrine of mootness. As a consequence, all such arguments are waived."). Finally, the District also maintains that we must resolve the compensatory education issue to determine whether D.C. was a prevailing party entitled to attorneys' fees. But, as explained below, that is not so.

### D.    Attorneys' Fees

The District challenges only D.C.'s prevailing party status, not the amount of the district court's fee award. Under the IDEA, a child is a prevailing party such that the child may receive attorneys' fees if he "attains a remedy" that: (1) "alters the legal relationship between the school district

and the [child with disabilities]"; (2) "fosters the purposes of the IDEA"; and (3) "receives judicial imprimatur." *Lauren C. ex rel. Tracey K. v. Lewisville Indep. Sch. Dist.*, 904 F.3d 363, 374 (5th Cir. 2018) (internal quotation marks and citation omitted).

Even setting the compensatory education award aside, D.C. received such a remedy, as the hearing officer ordered the District to modify D.C.'s IEP so as to provide him with reading comprehension instruction using Read 180 or a similar program. *See Krawietz*, 900 F.3d at 676, 678 (concluding that the child was a prevailing party because the hearing officer had ordered the district to modify the child's IEP). This modification: (1) clearly altered the relationship between D.C. and the District to D.C.'s benefit; (2) fostered the IDEA's purposes by providing D.C. with "*appropriate special services necessary* to education that [D.C.] had not received prior to the request for a due process hearing," *Angela L. v. Pasadena Indep. Sch. Dist.*, 918 F.2d 1188, 1195 (5th Cir. 1990);[16] and (3) received the required judicial imprimatur, *see Lauren C.*, 904 F.3d at 374 (noting that a hearing officer's order confers the necessary judicial imprimatur). Hence, we may uphold the district court's determination that D.C. was a prevailing party without considering the appropriateness of the hearing officer's award of compensatory education.

We AFFIRM.

---

[16] In *Lauren C.*, we misquoted *Angela L.* as stating that a remedy fosters the IDEA's purposes if the child "receives any appropriate special services that the child had not *requested* prior to the request for a due process hearing." *Lauren C.*, 904 F.3d at 376 (emphasis added) (misquoting *Angela L.*, 918 F.2d at 1195). Under our rule of orderliness, "one panel of this court cannot overrule the decision of another panel." *United States v. Dial*, 542 F.3d 1059, 1060 (5th Cir. 2008) (per curiam) (quotation omitted). Thus, our misquote in *Lauren C.* did not alter the rule established in *Angela L.*, which we follow here.

No. 20-20339

DON R. WILLETT, *Circuit Judge*, dissenting:

I cannot join the majority opinion because, in my judgment, this case presents no child find violation, no IEP inadequacy, and no basis for a compensatory education award.

My two principal areas of disagreement:

1. Whether or not the majority correctly concluded that the IEP was inadequate, the compensatory education award is inappropriate.
2. On this record we cannot conclude that the IEP was inadequate.

I

For starters, the compensatory education issue is not moot. Additionally, and under any standard of review, D.C. is not entitled to the compensatory education award he received.

A

The majority opinion mistakenly declines to address compensatory education on mootness grounds, pointing to judicial estoppel and waiver. This confusion began as a throwaway argument: In a single paragraph, D.C. posited that we "may . . . query" whether the compensatory education award is moot, based on the assertion that the District provided some quantity of compensatory education. D.C. did not explain this equivocation, provide any reasoning, or cite any authority; plus, as D.C. conceded, his mootness contention relies on factual assertions not found in the record.[1]

The majority opinion disregards the latter problem. To save the former, the majority opinion tries to fill in some reasoning: D.C. is judicially

---

[1] *See supra* III.C.

estopped from claiming further compensatory education, thus mooting the District's claim for reversal of compensatory education. I see at least three problems with this approach.

First, as the majority opinion acknowledges, mootness applies only when the court cannot grant *any* effectual relief.[2] That is not the case here, however, because nothing in the record proves that the District has provided the entire compensatory education award, nor has it "credibly pledged to the court" that it will do so.[3] Further, we have no factual basis to conclude that vacatur of the compensatory education award would provide *no* relief to the District.

Second, judicial estoppel has nothing to do with mootness. Judicial estoppel prevents parties from "assuming inconsistent positions in litigation" in a manner that "play[s] fast and loose with the courts to suit the exigencies of self interest."[4] So, judicial estoppel is about holding parties to the consequences of their *own* actions. And mootness is about claimants who have received everything they've asked for.[5] Therefore, it seems inapt to say

---

[2] *See infra* III.C (citing *Dierlam v. Trump*, 977 F.3d 471, 476 (5th Cir. 2020) ("If an intervening event renders the court unable to grant the litigant 'any effectual relief whatever,' the case is moot." (citation omitted))).

[3] *Infra* III.C (citing *Lee ex rel. MacMillan v. Biloxi Sch. Dist.*, 963 F.2d 837, 839 (5th Cir. 1992)).

[4] *Allen v. C & H Distributors, L.L.C.*, 813 F.3d 566, 572 (5th Cir. 2015) (citations omitted); *accord In re Oparaji*, 698 F.3d 231, 235 (5th Cir. 2012). The three elements of judicial estoppel are: "(1) the party against whom judicial estoppel is sought has asserted a legal position that is plainly inconsistent with a prior position asserted in a prior case; (2) the court in the prior case accepted that party's original position, thus creating the perception that one or both courts were misled; and (3) the party to be estopped has not acted inadvertently." *Id.* (citation omitted).

[5] *See Dierlam*, 977 F.3d at 476–77 ("[E]ven when the 'primary relief sought is no longer available,' 'being able to imagine an alternative form of relief is all that's required to keep a case alive.'" (citation omitted)).

that judicial estoppel's operating on one party can moot the claims of the *opposing* party as a general matter.[6]

Third, the majority opinion begins by stating that it must address mootness because it is an issue of subject-matter jurisdiction, but then proceeds to conclude that it cannot address the capable-of-repetition exception because of waiver. Addressing mootness is mandatory or it isn't. If parties can't forfeit arguments *against* subject-matter jurisdiction (i.e., mootness arguments), they can't forfeit arguments *in favor of* subject-matter jurisdiction (i.e., exception-to-mootness arguments).[7]

B

D.C. is not entitled to the compensatory education award he received because he has unclean hands. Further, he has the burden of proof but no evidence supporting his award.

1

As to unclean hands, D.C.'s aunt, who works for his lawyer, pressured the District into providing the unnecessary services for dyslexia that D.C. now challenges.[8] According to the hearing officer, she "set the tone for the meeting by informing the ARD Committee that she had 'sued' her own

---

[6] We have held *once* that judicial estoppel mooted a bankruptcy trustee's motion to substitute as the real party in interest in a maritime liability-limitation action, in place of the bankruptcy debtors who'd filed a personal-injury claim in that action. *In re Superior Crewboats, Inc.*, 374 F.3d 330, 336 (5th Cir. 2004). We later declined to apply *Superior Crewboats* beyond its facts, and it suffices to say that this case bears no resemblance to *Superior Crewboats. Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 386 (5th Cir. 2008).

[7] *Cf. Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 190–94 (2000) (reaching conclusion on mootness via addressing the capable-of-repetition exception); *accord Finnie v. Lee Cnty.*, 541 F. App'x 368, 372 (5th Cir. 2013).

[8] D.C.'s aunt began attending ARD meetings on February 7, 2018.

child's school district 'six times' and had been encouraging [D.C.'s] mother to do the same . . . for several years." The meeting was described as "unpleasant," "very charged and contentious," "tough," "hectic," and "exhausting." D.C.'s aunt was "'demeaning' to staff members from the District." And she hijacked the proceedings: "The evaluator who had conducted the [full individual evaluation for special-education eligibility] did not have a chance to discuss the evaluation," and the District's diagnostician "could not even fully present her own opinions." "Instead, [D.C.'s] aunt insisted to the ARD Committee that [he] should qualify as a student with Dyslexia."

As D.C. acknowledges, a compensatory education award is equitable relief.[9] And "he who comes into equity must come with clean hands."[10] The unclean hands doctrine prohibits equitable relief when "an individual's misconduct had immediate and necessary relation to the equity that the individual seeks."[11] It is entirely unfair for D.C. (really, his lawyer) to recover

---

[9] *See Eltalawy v. Lubbock Indep. Sch. Dist.*, 816 F. App'x 958, 964 n.9 (5th Cir. 2020) ("Compensatory education is an equitable remedy commonly sought in cases involving alleged violations of the Individuals with Disabilities Education Act (IDEA)." (collecting authorities)); *accord P.P. v. Nw. Indep. Sch. Dist.*, 839 F. App'x 848, 857 (5th Cir. 2020) (noting that the IDEA authorizes the district court to "grant such relief as the court determines is appropriate," which makes "equitable considerations . . . relevant in fashioning relief" (first quoting 20 U.S.C. § 1415(i)(2)(C)(iii), and then quoting *Sch. Comm. of Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369, 374 (1985)).

[10] Restatement (Third) of Restitution and Unjust Enrichment § 63 (Am. L. Inst. 2011); *see also* 4 Charles Alan Wright & Arthur R. Miller, 4 Fed. Prac. & Proc. Civ. § 1043 (4th ed. 2021) (explaining that after the merger of law and equity, "the maxims of equity continue to be a factor in determining both the plaintiff's right to be heard on a claim for equitable relief," including "the notion that a party seeking equitable relief must not have "unclean hands'").

[11] Glenn A. Guarino et al., *Misconduct of applicant; "clean hands" doctrine as consideration in granting injunctive relief*, 19 Fed. Proc., L. Ed. § 47:22. *Accord* Restatement (Third) of Restitution and Unjust Enrichment § 63 (Am. L. Inst. 2011) ("The idea is that a person who engages in inequitable conduct may

against the District for providing the wrong services because D.C. (really, his lawyer) *succeeded* in forcing it to provide exactly those services. *P.P. v. Northwest Independent School District* helps us here.[12] There, compensatory education was unwarranted because the parents "rejected several remedial services offered" by the district and "stymied [the district's] efforts" by refusing meetings and "refusing to adopt agreed-upon revisions" to the proposed IEP.[13] So too here. D.C. agreed with the IEP developed via the ARD process, declined compensatory services offered, and declined a follow-up meeting with the ARD committee.

2

*P.P.* also illuminates the second reason D.C. is not entitled to the compensatory education award he received—his need for and lack of proof. "Plaintiffs b[ear] the burden in the underlying due process hearing and on district court review to establish entitlement to compensatory education."[14] The plaintiff in *P.P.* failed to carry this burden because the expert who testified that P.P. needed 240 hours: (1) had no experience with P.P.'s learning disability, (2) did not review P.P.'s records, and (3) could not articulate any problem with the district's program.[15] Likewise, D.C. fails to meet his burden. No evidence demonstrated a current need for

---

forfeit the right to a judicial determination of what 'equity and good conscience' require of the other party to the transaction.").

[12] 839 F. App'x at 857.

[13] *Id.*

[14] *P.P.*, 839 F. App'x at 857.

[15] *Id.* at 857–58.

compensatory education.[16] Even setting that aside, the hearing officer's calculation relies on evidence corresponding to a learning disability that D.C. does not have.[17]

\*     \*     \*

My disagreement with the majority opinion's compensatory-education conclusion stands independent from my disagreement with the IEP-adequacy conclusion. Next, however, I will explain why I believe that we cannot conclude, on this record, that the IEP is inadequate.

## II

Everyone agrees that the district court incorrectly placed the burden of proof on the District to show that D.C.'s IEP was adequate. The majority opinion dismisses this problem in a footnote, again relying on waiver. But I am not persuaded that we can disregard the District's burden-of-proof

---

[16] It is undisputed that there is no evidence that D.C. still needed compensatory education by the time of the due process hearing; instead, the most recent evidence indicated that D.C. ended fifth grade at grade level.

[17] D.C.'s first expert said that 20 hours of compensatory education were necessary, after retracting his previous testimony that 60 to 80 hours were necessary as "an irascible senior moment." D.C.'s second expert testified that D.C. was entitled to 30 to 45 minutes of *dyslexia* instruction, individually or in a small-group format, for each day he'd been deprived of services. Despite concluding that dyslexia services were inappropriate for D.C., the hearing officer apparently relied on the second expert and concluded that D.C. was owed 45 minutes of individual reading-comprehension instruction, four days per week, for the year starting November 17, 2017, when the district would have timely convened an ARD meeting. The hearing officer did not walk through his calculation, but the number can be reached as follows: A school year is 75,600 minutes, Tex. Educ. Code § 25.081(a), and a school day must be at least 420 minutes, *id.* § 25.0815(b)(2)(B); therefore, the school year is 180 days or 36 weeks. (45 minutes x 4 days/week x 36 weeks = 6,480 minutes or 108 hours.) D.C. identified *no* evidence showing that dyslexia remediation is interchangeable with remediation for reading-comprehension difficulties. The district court accepted the hearing officer's conclusion without analysis.

argument, however imperfectly it was raised.[18] My point is not to rehash the district court's resolution of factual disputes; it's simply that the District set forth enough evidence that we cannot dismiss the burden-of-proof error as harmless. The majority opinion omits important facts in favor of the District from each of the four elements of IEP adequacy. For brevity's sake, I will discuss only the individualization element.

As to the individualization factor, the majority examines two services: dyslexia services and co-teach reading services. The dyslexia services are at best a wash—D.C. relentlessly demanded them, and this limited the District's ability to consider other services. The dyslexia services shouldn't count for D.C., and they definitely shouldn't count against the District.

The evidence regarding co-teach services is no more than a wash, either. D.C. points to the hearing officer's finding that the co-teaching services were provided as an accommodation, arguing that co-teaching was about permitting access, not ameliorating his reading-comprehension difficulties. Yet the hearing officer relied on testimony that, in full, states that co-teachers and general education teachers know "the accommodations and the goals for the student" and work together to support the student. According to the District, the "and the goals" language shows that co-teach services were about more than accommodation.

Last, D.C. complains that the evidence does not determine how much time the teacher spent helping him, as opposed to other children. But the evidentiary buck stops with D.C., who, as we have consistently stated, bears

---

[18] *T. B. by & through Bell v. Nw. Indep. Sch. Dist.*, 980 F.3d 1047, 1057 (5th Cir. 2020) (Higginson, J., dissenting) (citing *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 923 (11th Cir. 2018) ("[P]arties cannot waive the application of the correct law or stipulate to an incorrect legal test.")).

the burden to prove the inadequacy of the IEP.[19] Further, D.C. has no answer to the following evidence of individualization:

- The District correctly identified D.C.'s reading-comprehension issues.

- The ARD committee agreed on IEP goals for reading comprehension and fluency and provided a certified special education teacher to implement those goals.

- D.C.'s certified special-education teacher was provided as a "service" on the IEP; elsewhere the IEP provided "accommodations."

- The IEP scheduled 3.75 hours of co-teaching services to occur only during D.C.'s reading class.

- Only D.C.'s reading grade has both a regular education component and a special education component.

- D.C. received 40 minutes a day, 5 days a week of Leveled Literacy Intervention, the District's research-based program "to address his reading comprehension and fluency" difficulties.

If D.C. and the District come out evenly on the evidence related to dyslexia and co-teaching services—not to mention if the District has the better of D.C. in this regard—we cannot say that the evidence is "substantial and undisputed" or "overwhelmingly one-sided" in D.C.'s favor, such that the district court's burden-of-proof error was harmless.[20]

---

[19] *See, e.g.*, *Richardson Indep. Sch. Dist. v. Michael Z*, 580 F.3d 286, 292 n.4 (5th Cir. 2009) (collecting cases).

[20] *Sealed Appellee 1 v. Sealed Appellant 1*, 767 F.3d 418, 424–25 (5th Cir. 2013).

No. 20-20339

Facing similar errors, we have previously reversed or vacated and remanded, depending on the state of the evidence.[21] On this record, in my view, the evidence heavily favors the District and reversal would be appropriate. At minimum, however, we should vacate and remand.

\*      \*      \*

For these reasons among others, the majority opinion has, in my view, mistakenly substituted its "own notions of sound educational policy for those of the school authorities" we review.[22]

---

[21] *Compare Veasey v. Abbott*, 830 F.3d 216, 229 (5th Cir. 2016) (en banc) (explaining that, when factual findings are premised on a legal error, we vacate and remand unless "the record permits only one resolution of the factual issue") (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982)), *with Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 397 (5th Cir. 2012) (reversing and explaining that "[f]actual findings made under an erroneous view of controlling legal principles are reviewed *de novo*").

[22] *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017).